FRANCIS D. LANGSTROTH, Respondent, *v.* J. C. TURNER CYPRESS
LUMBER COMPANY, Appellant.

First Department, May 22, 1914.

Sale — action for breach of contract — evidence establishing execution
of contract — principal and agent — when selling agent acts within
scope of authority — Statute of Frauds — undisclosed principal liable
upon written contract executed by agent — when amount of goods
sold not indefinite — measure of damages.

Action to recover damages for breach of contract whereby the defendant
sold lumber to plaintiff's assignor. Evidence examined, and *held*, to be
sufficient to establish that the contract of sale was made by an agent of
the defendant, and that said agent in making the contract acted within
the scope of his actual and apparent authority.

Where an agent has general authority to accept orders and make con-
tracts of sale, or assumes that authority with the knowledge of his
principal, he may bind the latter by a contract of sale, although he was
required to consult his principal as to prices and did not do so.

A contract for the sale of goods which fully satisfies the Statute of Frauds
is enforcible against an undisclosed principal although the agent exe-
cuted the contract in his own name.

A written contract providing for an actual sale of a specified number of
feet of lumber, with an option to the buyer of increasing the quantity if
the seller has sufficient stock, is not indefinite as to the quantity sold,
where the buyer never exercised the option.

On a breach of a contract for the sale of goods the measure of damages is
the difference between the purchase price and the market price at the
time and place of delivery. Where no time of delivery is stated in the
contract the market price must be fixed as at a reasonable time, which
depends upon all the circumstances of the case.

APPEAL by the defendant, J. C. Turner Cypress Lumber
Company, from a judgment of the Supreme Court in favor of
the plaintiff, entered in the office of the clerk of the county of
New York on the 15th day of January, 1914, upon the report of
a referee appointed to hear and determine the issues.

*Harcourt Bull*, for the appellant.

*Charles F. Williams* [*Eustace Conway* with him on the
brief], for the respondent.

Judgment affirmed, with costs, on opinion of the referee.

Present — INGRAHAM, P. J., McLAUGHLIN, LAUGHLIN, DOW-
LING and HOTCHKISS, JJ.

The following is the opinion of the referee:

CHARLES C. NADAL, Referee:

This action is brought to recover damages for the breach of
an alleged contract made on September 11, 1905, whereby the
defendant sold to the plaintiff's assignors, Henson & Pearson,
350,000 feet of lumber. The contract is in the form of a pencil
writing in the memorandum book of Henson, and is as follows:

"Sept. 11th, 1905 Sold H & P — 1 cargo up to 350 M — H
& P option of increasing to 500 M if J. C. Turner has stock.
22.00 Cif Phila — Basis 5.25 freight — H & P to get benefit of
any lower freight — Terms free Wharfage — 2% on discharge less
freight — 80 of clear K Dried 4/4 Saps — small % 5/4 if possi-
ble — Inspection guaranteed M J E Hoban "

The defendant denies the making of the contract, denies that
Hoban, who signed the memorandum, had authority to make
any such contract on its behalf, and alleges that the contract is
within the Statute of Frauds, and, therefore, void.

I. As to the making of the contract. Henson testified that
on the evening of September 11, 1905, he, Hoban, Mrs. Hoban
and a friend dined together at a restaurant in New York city,
and that the alleged contract was entered into and the memo-
randum made and delivered on that occasion and that one or
two days later Hoban notified him that the quantity could not
be increased above 350,000, as Mr. Turner had sold all the
balance of the boards. Hoban's testimony was substantially
to the same effect. There is practically no contradiction of
this evidence. The testimony of Mr. Bull as to his conversa-
tion with Hoban would not, I think, justify the conclusion that
the contract was not made as testified to by both Henson and
Hoban. It was natural that Hoban should evince a desire to
carry out his employer's wishes.

II. As to the authority of Hoban to make the sale. Hoban
says that before making the sale Turner expressly authorized
it. Turner, on the other hand, says he directed Hoban not to

make the sale. Thus we have a flat contradiction as to instructions given as to making this sale.

Hoban testifies that he had been in the employ of the defendant for nine or ten years and for six or seven years had been engaged in selling lumber for defendant; that his position was that of assistant to the president, his duties being inside the office; he made sales and signed contracts for the sale and delivery of lumber every day, sometimes two or three times a day; that he had charge of the office during the absence of the president; that no one was allowed to take orders even over the telephone but Turner and himself, but that he had to consult Turner about prices. The witness, McHugh, bookkeeper for defendant, corroborates the testimony of Hoban as to the latter's position and duties, and the work Hoban actually did. He said that the persons who actually made sales were Turner, Hoban and Lloyd, an outside salesman, and when orders came in they were reported to one of these persons. The testimony of these two witnesses as to the actual practice followed in conducting defendant's business indicates that Hoban had very general powers in the matter of selling lumber, being apparently limited only by the necessity of consulting Turner as to prices. The only evidence in contradiction of the testimony of these two witnesses was that of Mr. Turner, president of defendant. He testified that he hired Hoban; that he told Hoban his duties were to answer telephone inquiries and if any one asked them to ship lumber to take down the order and submit it to him (Turner). He also authorized Hoban to answer letters when Turner was away, but any quotations he made were to be referred to Turner. Turner also testified that he never told Hoban he could make contracts for the sale of future delivery of lumber and never knew Hoban to sign any contract for such sale or delivery. This is the substance of Turner's testimony so far as the duties or powers of Hoban were concerned. It does not appear when Turner gave Hoban the instructions as to his duties. It was apparently at the time of hiring, nine or ten years before the sale. The actual practice that grew up and was apparently being followed at the time of the sale in question would, of course, override the instructions. Besides, the instructions are not necessa-

rily in conflict with authority to sell. They contemplate that Hoban would quote prices, such quotations to be referred to Turner. Surely, an agreement made or price quoted by Hoban would be binding on defendant even if Turner thereafter found it unsatisfactory. Hoban had to consult Turner about prices. Every salesman presumably has to get the price at which he sells from his employer, but that would not invalidate a sale made by an authorized salesman at a price not approved by the employer. Besides, there is no claim in this case that the price at which the sale was made was unsatisfactory. On the contrary, Turner says in his letter of October 8, 1905, that "the price is O. K."

Whatever may be the truth as to the instructions given to Hoban concerning this particular sale, I cannot avoid the conclusion that Hoban did have, or at least assumed, with the knowledge of the defendant, to have general authority to accept orders and make contracts for the sale of lumber, being limited only as respects prices quoted. The letter written by Turner to Hoban, dated October 8, 1905, seems to confirm this view. He there says:

"Not having heard from Henson as to K. D. saps & as price is firmer, and as T. C. Co. are not making enough to get 3rd cargo probably till April, and as they may sell out, it would be advisable not to accept the order if he sends it. The price is O. K. but the other conditions are not, just at present. Might say that T. C. Co. are about to sell their Y. P. and hence not in position to take order, though if they want to take a small cargo of say 300 M. & subject to our being able to furnish it April or later, it will be O. K. For the present we had better not work on Y. P."

This letter shows that Hoban did make sales, and the expressions used indicate that the writer is addressing a person having rather broad powers. If Hoban could only make sale when told to do so, one would have expected the letter to be couched in different terms. Thus he says, "It would be advisable not to accept the order," and, "for the present we had better not work on Y. P." He is apparently expressing merely his views leaving Hoban to follow them or not as he sees fit. Besides, this letter shows that Mr. Turner knew at least something

about the Henson & Pearson matter, apparently regarding negotiations as still pending. He says " the price is O. K.," but that other conditions are not so. What conditions are unsatisfactory does not appear. He further says that if they (Henson & Pearson) want to take a cargo of, say, 300,000 subject to same being furnished April or later it will be all right. The sale made seems to come very near to being about what Turner says would be satisfactory.

Furthermore, McHugh testifies that about the time the sale was alleged to have been made Turner mentioned to him that this " order or sale or whatever it was," was not satisfactory. Turner does not positively contradict this testimony; he merely says that he does not recall this conversation.

Still another point which seems to me to be of importance is the correspondence that took place between Henson & Pearson and the defendant some months prior to the sale. On November 14, 1904, Henson & Pearson wrote to the defendant as follows: " Do you handle any other kinds of lumber than cypress? If so please state upon what you are in position to quote to advantage."

That letter was answered on Nov. 9, 1904, by Hoban, on the letter paper of the defendant, as follows:

" We are in receipt of your favor of Nov. 4th. In reply beg to advise that just at present we are not handling anything but cypress. A little later on we may arrange to market the output of our own yellow pine mills, but at present we will not do this. You might correspond with the Ocmulgee River Lumber Co. at Lumber City, Ga., when you are needing any yellow pine flooring or when you are in the market for Interior Pennsylvania carload deliveries of yellow pine and they will be glad to quote you.

" Thanking you for your favor, we are

"Yours very truly,

"J. C. TURNER CYPRESS LUMBER CO.

"M. J. E. HOBAN."

I cannot but feel that Henson & Pearson upon receiving such a letter as that, signed by Hoban, in reply to their letter, were justified in understanding that Hoban was a person of

some general powers in the defendant's business. It is not claimed that this letter was unauthorized. By permitting Hoban to write such a letter the defendant held him out impliedly as having authority to act for defendant in the matter of the sale of lumber.

I am led, therefore, to the conclusion that Hoban in making the contract acted within the scope of his actual and apparent authority.

III. Is the contract within the Statute of Frauds and hence void ?  Our statute reads:

"Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking: * * *

"6. Is a contract for the sale of any goods, chattels or things in action for the price of fifty dollars or more, and the buyer does not accept and receive part of such goods, or the evidences, or some of them, of such things in action; nor at the time, pay any part of the purchase money." *

The defendant's contention is that the contract is void because it does not name any vendor other than Hoban who signed the memorandum, and it cites in support of its contention the case of *Mentz* v. *Newwitter* (122 N. Y. 491). That was an action to recover from the purchaser of real estate at auction the difference between the amount bid and the sum for which the real estate was subsequently sold upon refusal of the purchaser to complete his purchase. The memorandum of sale was signed by the auctioneer, but the vendor's name did not appear. The court stated the rule to be that to make the memorandum conform to the statute the essentials, which must appear either from the memorandum itself or from a reference therein to some other writing, are " the subject-matter of the sale, the terms and the names, or a description of the parties," and held that inasmuch as the vendor's name did not appear in the memorandum, the contract did not conform to the statute, and was, therefore, void.

* See Pers. Prop. Law (Gen. Laws, chap. 47; Laws of 1897, chap. 417), § 21, subd. 6; re-enacted by Pers. Prop. Law (Consol. Laws, chap. 41; Laws of 1909, chap. 45), § 31, subd. 6. See Id. §§ 85, 157, added by Laws of 1911, chap. 571.—[REP.

In *Ward* v. *Hasbrouck* (169 N. Y. 407), following the *Mentz* case, the court reached the same conclusion, laying stress upon the fact that the agent who signed the letters which constituted the contract signed them as agent. These and other cases to like effect cited in the defendant's brief are not, as it seems to me, applicable to the case at bar. They all proceed upon the theory that the agent acting avowedly as agent for some one else whose name does not appear in the memorandum is not liable under the contract, and, therefore, no one is indicated against whom the contract can be enforced. There is a clear distinction between such a case and one where the person signing the memorandum acts so far as the memorandum discloses for himself, and is, therefore, personally liable under the contract. Such a contract obviously could be enforced as between the parties named in it, and, therefore, must be in conformity with the statute. My attention has not been called to any case where it has been held that a contract which upon its face is complete, showing all the essentials necessary to take it out of the statute, is not enforcible merely because one of the parties named apparently acting on his own behalf was in fact acting for an undisclosed principal. And when such a contract is made in a form that fully satisfies the statute and is, therefore, enforcible as between the parties named, can it be that it is not enforcible as against the undisclosed principal of one of those parties? I know of no authority for such a proposition. On the contrary, the cases hold that such a contract is in conformity with the statute and can be enforced against the principal.

In *Dykers* v. *Townsend* (24 N. Y. 57), one Hoyt acting so far as the memorandum disclosed for himself but actually for another, purchased shares of stock from the plaintiff, and the court held that the contract conformed to the Statute of Frauds and could be enforced against Hoyt's principal. The court there said: "It seems to have been too long and too well settled that an action can be maintained against a principal upon a contract for the sale of goods made by an agent in his own name to be now changed, whatever we may have thought of it as an original question; and this, as well where the contract is within the Statute of Frauds as where it is not."

In *Briggs* v. *Partridge* (64 N. Y. 357) Mr. Justice ANDREWS, citing the *Dykers* case and others, said: "The plaintiff invokes in his behalf the doctrine that must now be deemed to be the settled law of this court, and which is supported by high authority elsewhere, that a principal may be charged upon a written parol executory contract entered into by an agent in his own name, within his authority, although the name of the principal does not appear in the instrument, and was not disclosed, and the party dealing with the agent supposed that he was acting for himself, and this doctrine obtains as well in respect to contracts which are required to be in writing, as to those where a writing is not essential to their validity."

The *Briggs* case has been frequently cited and approved in later cases. (See *Nicoll* v. *Burke*, 78 N. Y. 580; *Woodhouse* v. *Duncan*, 106 id. 527; *Brady* v. *Nally*, 151 id. 258; *City Trust, Safe Deposit & Surety Co.* v. *American Brewing Co.*, 182 id. 285; *Case* v. *Case*, 203 id. 263.)

In *Salmon Falls Manufacturing Company* v. *Goddard* (14 How. [U. S.] 446) the court said: "Extraneous evidence is also admissible to show that a person whose name is affixed to the contract, acted only as an agent, thereby enabling the principal either to sue or be sued in his own name; and this, though it purported on its face to have been made by the agent himself, and the principal not named."

Though there is some apparent confusion among the cases that confusion arises, as it seems to me, chiefly from the use of inexact terms.

In the case of *Mertz* v. *Hubbard* (75 Kan. 1; 88 Pac. Rep. 529) the court points out the distinction quite clearly. After stating the rule that a memorandum in order to meet requirements of the statute must give the names of the contracting parties the court says: "Where a written agreement for the sale of lands is entered into by two competent persons, each apparently acting for himself, the requirements of the statute of frauds are fully met, and the result is a valid and enforceable contract. Being then complete it has no further concern with the statute. It is like any ordinary written contract. Parol evidence cannot vary its terms but may add a new obli-

gor or obligee by showing that one or the other of the parties was in fact acting as the authorized agent of a third person. The authorities are practically unanimous on this proposition. * * * But, when the writing discloses that one of the persons is avowedly acting as an agent for someone else, who is not named or described, an entirely different situation is presented. An imperative requirement of the statute is that the memorandum must indicate the parties." (See, also, Editor's Notes, *Walker* v. *Hafer*, 24 L. R. A. [N. S.] 315.)

In this case we have a complete contract upon its face between Hoban and Henson & Pearson. All the essentials necessary to satisfy the Statute of Frauds are present. The parties, the subject-matter and the terms are all set forth. The statute having thus been satisfied, the contract could have been enforced as against Hoban and hence can be enforced as against Hoban's principal.

I cannot agree with the defendant's counsel that the quantity of lumber to be sold is not fixed. The contract as I read it plainly provides that one cargo of 350,000 feet of lumber is sold to Henson & Pearson, with an option in the latter of increasing the quantity to 500,000 feet if J. C. Turner has stock. Henson & Pearson, so far as appears, never attempted to exercise this option. Whether they could have done so or how is unimportant.

IV. As to the measure of damages. The measure of damages in such a case is the difference between the purchase price and the market price at the time and place of delivery. (*Saxe* v. *Penokee Lumber Co.*, 159 N. Y. 371.) Where no time of delivery is fixed by the contract the market price must be fixed as at a reasonable time (*Kipp* v. *Wiles*, 3 Sandf. 585), and what shall be taken to be a reasonable time must depend upon all the circumstances of the case. (*Sloan* v. *McKane*, 131 App. Div. 244.) The evidence here is that a reasonable time for the delivery of a cargo of lumber of the kind in question is two, three or four months. It also appears that in January or February Hoban told Henson that the lumber would be delivered in the spring, to which Henson apparently made no objection. This, it seems to me, may be fairly regarded as determining what shall be deemed a reasonable time and that the measure of

damages should be the difference between the price named in the contract and the market price in the spring of 1906. Several witnesses testified as to the market prices of lumber, the lowest price given during the spring and summer of 1906 being from twenty-seven dollars to twenty-eight dollars per 1,000 feet. I think, therefore, that twenty-seven dollars should be taken as the market price at the time when delivery should have been made and that the plaintiff is entitled to recover the difference between that price and the price named in the contract.